

50 Jericho Quadrangle, Suite 300
Jericho, New York 11753-2728
(516) 832-7500
Fax: (516) 832-7555

December 19, 2006

**VIA ECF & REGULAR MAIL**
Honorable Leonard D. Wexler, U.S.D.J.
United States District Court for the
 Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

       RE:     **Robert Thornton, Julia Thornton and Jackie Costa v. New York Islanders Hockey Club, L.P.**, 05 Civ. 5715 (LDW) (ARL)

Dear Judge Wexler:

      I write on behalf of the New York Islanders Hockey Club ("Islanders" or "Defendant") pursuant to the Court's motion practice rules, to request a pre-motion conference in anticipation of filing a FRCP 56(b) summary judgment motion to dismiss Plaintiffs' Complaint in its entirety.

      The Plaintiffs quit their jobs at Iceworks, the Islanders' Syosset, New York public ice skating and practice facility: Robert Thornton ("RT") by resignation letter dated May 24, 2004; his wife Julia Thornton ("JT") by resignation letter dated May 25, 2004; and Jackie Costa ("JC") pursuant to a September 18, 2004 letter she delivered to the Islanders on September 20, 2004, which stated that she would quit if the Islanders did not immediately change the staff in the Iceworks business office where she worked. Plaintiffs now claim that they were constructively discharged, and that there was a conspiracy by the Islanders to drive them from their jobs because of their age. At the time that they quit, RT was 56 years old, JT was 54 years old and JC was 48 years old.

      As this Court has previously recognized, in order to prevail on a claim for constructive discharge, a plaintiff must prove that his employer "deliberately [made his] working conditions so intolerable that [he was] forced into an involuntary resignation." Fraser v. SUNY Stony Brook, 769 F.Supp. 91, 94 (E.D.N.Y. 1991) (citations omitted). The Second Circuit has stated the applicable standard as follows:

> Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.

Mack v. Otis Elevator Co., 326 F.3d 116, 128 (2d Cir. 2003).

10219535.1

Honorable Leonard D. Wexler, U.S.D.J.
December 19, 2006
Page 2

In assessing a constructive discharge claim, courts focus on two requirements: "the employer's intentional conduct and the intolerable level of the work conditions." Palomo v. Trustees of Columbia Univ., 2005 U.S. Dist. LEXIS 14428, at *50 (S.D.N.Y. July 20, 2005), aff'd, 2006 U.S. App. LEXIS 6133 (2d Cir. Mar. 10, 2006). With regard to the requirement of intentional conduct, "if a plaintiff suing for constructive discharge cannot show specific intent, he or she must at least demonstrate that the employer's actions were deliberate and not merely negligent or ineffective." Id.

The determination as to whether work conditions were so intolerable as to compel the employee to resign is made "objectively by reference to a reasonable person in the employee's position." Id. "Success does not depend upon the plaintiff's subjective beliefs." Hockeson v. New York State Office of General Svcs., 188 F. Supp. 2d 215, 220 (N.D.N.Y. 2002). The plaintiff must establish "the sort of circumstances that would cause a reasonable person to conclude that quitting was the only way she could extricate herself from intolerable conditions." Petrosino v. Bell Atlantic, 385 F.3d 210, 231 (2d Cir. 2004).

Finally, it is well established that the burden of proving a constructive discharge claim lies with the plaintiff and "is not an easy one to carry." Benette v. Cinemark U.S.A., Inc., 295 F. Supp. 2d 243, 256 (W.D.N.Y. 2003). Indeed, a plaintiff must demonstrate "aggravating factors" that render the workplace intolerable. Garrett v. Mazza, 2005 U.S. Dist. LEXIS 20403, at *12 (S.D.N.Y. Sept. 19, 2005). Courts in the Second Circuit have held that "a reasonable person should be able to tolerate a considerable amount of unpleasantness on the job without feeling compelled to resign." Id. (citing cases).

The facts disclosed and adduced during discovery in this case fall far short of those required by plaintiffs to meet the substantial "constructive discharge" claim burden discussed above. Indeed, the undisputed facts, including but not limited to the following, are plainly to the contrary:

-- the Islanders purchased the lease for the Iceworks facility in a bankruptcy auction on or about March 2, 2001, and retained the existing Iceworks employees, including RT, JT and JC, as respectively, Iceworks' General Manager, Office Manager and Bookkeeper.

-- at the time they were offered employment and became Islanders employees, RT, JT and JC were respectively, 53, 51 and 44 years old; the other Iceworks employees (figure skating and hockey instructors, etc.) at all times material herein ranged in age from 18 to 66.

-- during their Islanders employment, RT and JT each received a salary increase, and JC received two salary increases (the second one shortly before she quit on September 21, 2004).

-- the fringe benefits package for each plaintiff was enhanced during their Islanders employment.

10219535.1

Honorable Leonard D. Wexler, U.S.D.J.
December 19, 2006
Page 3

    -- each plaintiff continued to perform his/her previous job duties, and no material changes were made in the conditions or perquisites of their employment (e.g., RT retained his personal office; JC continued to work her 4-day, reduced hours schedule).

    The Islanders plan for the Iceworks facility was to dramatically upgrade it from the "dump" it had become during the previous bankrupt ownership period into a first-class public ice skating and Islanders team practice facility. Those efforts took on renewed vigor in or about June 2003 when the Islanders assigned certain Islanders organization employees – those with established sports marketing and community relations credentials – to oversee the improvements and to take the steps necessary to "brand" Iceworks as an "Islanders" facility. The record reflects plaintiffs' resistance – particularly that of RT – to the various changes the Islanders wanted to make. RT even resisted and maligned the Islanders' plan to increase patronage by allowing the facility to be used for children's birthday parties, and for arranging to have the Islanders' well-known mascot, Sparky, skate with the children who used the facility. The record will reflect that as far as RT was concerned, he had run the facility for many years his own way and he saw no reason to make or cooperate in making the changes the Islanders wanted.

    At a February 2004 meeting with RT and JT, the Islanders' owner told RT that he was not happy with him because of his continued resistance to change. At that same meeting, he told JT that he was happy with her and her performance. Since only two years separated the then 56 year-old RT and his 54-year-old wife, it is absurd to argue, as the plaintiffs do, that their age played any role in this discussion or in any other actions or decisions made by the Islanders in this case, let alone that any such actions were so "intolerable" as to establish a constructive discharge claim. Indeed, such a claim is further refuted by the undisputed fact that at this February 2004 meeting, the Islanders' owner specifically told RT and JT that he had no intention of firing them, and that he wanted them to work cooperatively with the Islanders staff he had assigned to oversee and to "brand" the Iceworks facility. Less than four months later, RT and JT quit and gave two-weeks notice (another fact that is inconsistent with their constructive discharge claim). The third plaintiff, JC, quit several months later (after she returned from an extended vacation in September 2004), because she was unhappy about additional work she took upon herself because of the earlier departure of RT and JT, and was dissatisfied with the performance of her co-workers.

    Defendant looks forward to the opportunity to discuss its intended summary judgment motion in greater detail, and to answer any questions the Court may have about it, at the Court's earliest convenience.

                                                  Respectfully submitted,
                                                  /s/
                                            _____

Of Counsel:                                Nixon Peabody LLP
    Daniel A. Rizzi (DAR-7153)         50 Jericho Quadrangle, Suite 300
    Tara Eyer Daub (TE-7943)           Jericho, New York 11753
                                               516-832-7594

                                               *Attorneys for the New York Islanders*
                                               *Hockey Club, LP*

10219535.1